1 | MELINDA HAAG (CABN 132612)
United States Attorney

**FILED**

MAY 22 2013

2

3 | ALEX G. TSE (CABN 152348)
Chief, Civil Division

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

4 | ILA C. DEISS (NYBN 3052909)
Assistant United States Attorney

5

6 |   450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7124

7 |   FAX: (415) 436-7169
    ila.deiss@usdoj.gov

8

9 | Attorneys for United States of America

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

**DMR**

12 | SAN FRANCISCO DIVISION

13 | **CV 13 2340**

14

15 | UNITED STATES OF AMERICA,          ) CIVIL ACTION NO. _____

16 |          Plaintiff,                )
                                       )
17 |      v.                           ) **COMPLAINT OF THE UNITED STATES OF
                                       ) AMERICA**
18 | REUNION MORTGAGE, INC., and        )
                                       )
19 | DAVID THAYER                       ) <u>**Jury Trial Demanded**</u>
                                       )
20 |          Defendants.              )

21

22 |          The United States of America (the "United States" or the "Government"), by its attorney,

23 | Melinda Haag, United States Attorney for the Northern District of California, brings this action against

24 | Reunion Mortgage, Inc. ("Reunion") and its President, David Thayer, ("Thayer"), (collectively,

25 | "Defendants"), alleging upon information and belief as follows:

26 |                               **INTRODUCTION**

27 |          1.     This is a civil fraud action by the United States to recover treble damages and civil

28 | penalties under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729 et seq., and common-law

damages arising from fraud on the United States Department of Housing and Urban Development ("HUD") in connection with Reunion's residential mortgage lending business.

2.      As one of its functions, HUD, through its Federal Housing Administration ("FHA"), insures lenders against losses on mortgage loans to home buyers pursuant to the provisions of the National Housing Act.  12 U.S.C. §§ 1701-1701z-17 (2006).  Under HUD-FHA's mortgage insurance program, if a homeowner fails to make payments on the mortgage loan and the mortgage holder forecloses on the property, HUD-FHA will pay the mortgage holder the balance of the loan (together with interest due and other costs) and assume ownership and possession of the property.

3.      As set forth more fully below, under FHA's Direct Endorsement program, HUD-FHA insured twelve (12) materially deficient loans that Defendants certified to HUD-FHA met the requirements for proper underwriting, when Defendants knew that the loans had not been properly underwritten and were ineligible for FHA insurance.  The twelve loans will be referred to herein as the "Covered Transactions."

4.      As a result of Defendants' and their representatives' false certifications to HUD-FHA that the Covered Transactions met the program's requirements for underwriting, HUD/FHA insured the Covered Transactions and paid $1,630,527.89 in insurance claims on the defaulted Covered Transactions.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345.

6.      Defendant Reunion is a California corporation with its principle place of business in this District and is subject to the jurisdiction of this Court.

7.      Defendant David Thayer, Reunion's President, Director, and Designated Broker, resides in this District.  Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b).

## THE PARTIES

8.      At all times material to this civil action, HUD-FHA was an agency and instrumentality of Plaintiff United States and its activities, operations, and contracts were paid from Federal funds.

9.      Defendant Reunion, a mortgage lender, is a California corporation with its principal place of business in Milpitas, California.

10.      Defendant David Thayer was at all relevant times the President and Director of Reunion and resides in Pleasanton, California.

11.      Further, at all times relevant, Defendant Reunion identified Defendant David Thayer as its designated officer/broker with the responsibility for supervision and control of its employees and David Thayer acknowledged and accepted this responsibility.

## THE FALSE CLAIMS ACT

12.      The FCA provides liability for any person (i) who "knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B).  The FCA further provides that any person who violates the Act: "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a); see 28 C.F.R. § 85.3(a)(9).

13.      Under California law, the solicitation of residential mortgages is regulated by the California Department of Real Estate ("CA DRE").  Only CA DRE licensed brokers or CA DRE licensed agents acting under the supervision of a broker may engage in the business of residential mortgage loan solicitation.

14.      Under California law, a corporation may hold a real estate broker's license.

15.      At all times relevant to this complaint, Reunion Mortgage, Inc., was licensed with the CA DRE as a real estate broker.

16.      Under California law, a corporate broker must designate an officer as the broker for the corporation.  A California corporate real estate broker operates only through and because of the license of its designated officer.

3

17.     Under California law, the corporation's designated officer/broker "shall be responsible for the supervision and control of the activities conducted on behalf of the corporation by its officers and employees necessary to secure full compliance with the provisions of this division." Cal. Bus. & Prof. Code § 10159.2(a).

18.     At all times relevant, Defendant Reunion identified Defendant David Thayer as the designated officer/broker with the responsibility for supervision and control of its employees.

19.     At all times relevant, Defendant David Thayer, through annual certifications to HUD-FHA, manifested his consent to each DEL underwriter to act on his behalf as the designated officer/broker. Each DEL underwriter consented to this relationship by accepting the responsibilities of a DEL underwriter and certifying that each loan was eligible for FHA mortgage insurance in compliance with HUD Handbook 4000.4. Further, while underwriting and certifying each loan the DEL underwriter was acting within the scope of his or her employment.

## FACTUAL BACKGROUND

### A.     FHA Direct Endorsement Program Overview

20.     HUD-FHA mortgage insurance programs help low- and moderate-income families become homeowners by lowering down payment requirements, some closing costs, and qualifying criteria.  By protecting lenders against default on mortgages, HUD-FHA mortgage insurance encourages lenders to make loans to otherwise creditworthy borrowers that might not qualify under conventional underwriting requirements.

21.     To assist as many qualified homeowners as possible, and to provide maximum economic opportunities to lenders interested in obtaining HUD-FHA insurance on mortgages loans they make, FHA operates the Direct Endorsement Lender ("DEL") program.  The DEL program grants participating lenders in the private sector the authority to endorse mortgages that are qualified for HUD-FHA insurance.  In reviewing mortgages for eligibility for HUD-FHA insurance, DELs are entrusted with safeguarding the public from taking on risks that exceed statutory, regulatory and programmatic limits. DELs act as fiduciaries of HUD-FHA in underwriting mortgages and endorsing them for HUD-FHA

1    insurance.

2        22.    To obtain and maintain Direct Endorsement Lender status, a DEL must submit an annual

3    certification to HUD-FHA as follows:

> I know or am in the position to know, whether the operations of the above-named
> mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify
> that to the best of my knowledge, the above-named mortgagee conforms to all
> HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the
> above-named mortgagee is fully responsible for all actions of its employees
> including those of its HUD-FHA approved branch offices.

8        23.    The annual certification requires compliance with the basic eligibility requirements for

9    DELs, which includes compliance with the mandatory HUD-FHA rules concerning quality control, such

10   as the rule requiring review of all early payment defaults.

11       24.    To qualify for HUD-FHA mortgage insurance, a mortgage must meet all of the applicable

12   HUD-FHA requirements.  Those requirements relate to, among other things, the adequacy of the

13   borrower's income to meet the mortgage payments in addition to other financial obligations, the

14   borrower's creditworthiness, and the borrower's available cash to close the transaction and that amount

15   in light of the borrower's savings history.

16       25.    On a mortgage-by-mortgage basis, HUD-FHA requires DELs to conduct due diligence to

17   ensure that each mortgage is eligible for HUD-FHA insurance as set forth in HUD-FHA rules.  These

18   rules exist to prevent HUD-FHA from insuring mortgages that exceed the risk levels set by statute and

19   regulations.  A DEL must assure HUD-FHA that every endorsed mortgage meets all HUD-FHA rules.

20   HUD-FHA requires the DEL to certify, for each mortgage the lender endorses, that the lender has

21   conducted due diligence in accordance with all HUD-FHA rules and to the integrity of the data and

22   documentation used to endorse the loan.

23       26.    The DEL Program generally works as follows: The DEL originates a proposed loan or, in

24   some instances, acts as a sponsoring lender by underwriting and funding proposed mortgages originated

25   by other FHA-approved lenders known as correspondents or third-party originators.  In either case, the

26   DEL ultimately reviews and is responsible for the proposed mortgage.  The borrower, along with the

27   DEL's representative, completes the loan application.  A loan officer collects all supporting

28   documentation from the borrower and submits the application and documentation to the DEL.  A

1   professional underwriter employed by the DEL performs a mortgage credit analysis to determine the

2   borrower's ability and willingness to repay the mortgage debt.  The DEL's underwriter makes the

3   underwriting decision as to whether the mortgage may be approved for HUD-FHA insurance or not,

4   according to HUD-FHA rules.  This process is referred to as "manual underwriting."  As described

5   further below, the DEL may also use an FHA-approved automated underwriting system ("AUS") to

6   analyze the borrower's creditworthiness.  If the DEL has decided that the mortgage may be approved for

7   HUD-FHA insurance in accordance with HUD-FHA rules, the DEL funds the loan.  Thereafter, the DEL

8   certifies that the mortgage qualifies for HUD-FHA insurance.  FHA endorses the loan on the basis of the

9   DEL's certification and provides the DEL with a mortgage insurance certificate.

10         27.     Regardless of whether the loan is manually underwritten or underwritten with the

11   assistance of an AUS, the DEL is responsible for all aspects of the mortgage application, the property

12   analysis, and the underwriting of the mortgage.  HUD-FHA endorses mortgages in reliance upon the

13   DEL's certifications that the mortgages are eligible for HUD-FHA insurance.  Significantly, DELs

14   obligate HUD-FHA without prior independent HUD-FHA review.

15         28.     HUD-FHA grants DEL authority to the lender, not any individual underwriters.

16   However, to qualify for HUD-FHA approval as a DEL, a lender must have a qualified underwriter on

17   staff.  The underwriter's responsibilities are critical elements of the DEL Program, and each DEL must

18   certify that its underwriters meet HUD-FHA qualifications.

19         29.     An underwriter must be a full-time employee of the mortgage lender and must either be a

20   corporate officer with signatory authority or otherwise be authorized to bind the mortgage lender in

21   matters involving origination of mortgage loans.  An underwriter must also be a reliable and responsible

22   professional who is skilled in mortgage evaluation and able to demonstrate knowledge and experience

23   regarding principles of mortgage underwriting.

24         30.     HUD-FHA's DEL Code of Ethics requires the lender to conduct its business operations

25   in accordance with accepted sound mortgage lending practices, ethics, standards, and all federal and

26   state laws applicable to mortgage banking.  See HUD Handbook 4155.2.

27         31.     An underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and

28   stability of income to meet the periodic payments under the mortgage and all other obligations, and the

6

1   adequacy of the mortgagor's available assets to close the transaction, and render an underwriting

2   decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

3       32.     HUD-FHA relies on DELs to conduct due diligence on loans originated under the DEL

4   Program. The purposes of due diligence include determining a borrower's ability and willingness to

5   repay a mortgage debt, thus limiting the risk of default and collection difficulties. *See id.* Due diligence

6   thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, and cash

7   to close. In all cases, a DEL owes HUD-FHA the duty, as prescribed by federal regulation, to "exercise

8   the same level of care which it would exercise in obtaining and verifying information for a loan in which

9   the mortgagee would be entirely dependent on the property as security to protect its investment." 24

10  C.F.R. § 203.5(c)).

11      33.     HUD-FHA has set specific rules for due diligence predicated on sound underwriting

12  principles. In particular, HUD-FHA requires DELs to be familiar with, and to comply with, governing

13  HUD-FHA Handbooks and Mortgagee Letters, which provide detailed processing instructions to DELs.

14  These materials specify the minimum due diligence requirements with which DELs must comply.

15      34.     With respect to ensuring that borrowers have sufficient credit, a DEL must comply with

16  governing HUD-FHA Handbooks, such as HUD 4155.1, and evaluate whether a borrower has the ability

17  and willingness to repay the mortgage debt. HUD-FHA has informed DELs that past credit performance

18  serves as an essential guide in determining a borrower's attitude toward credit obligations and in

19  predicting a borrower's future actions.

20      35.     To properly evaluate a borrower's creditworthiness, a DEL must, at a minimum, obtain

21  and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or

22  interested parties; inspect documents for proof of authenticity; obtain adequate explanations for

23  collections, judgments, recent debts and recent credit inquiries; establish income stability and make

24  income projections; obtain explanations for any gaps in employment; document any gift funds; calculate

25  debt ratios and compare those ratios to the fixed ratios set by HUD-FHA rules; and consider and

26  document any compensating factors permitting deviations from those ratios.

27      36.     In order to help lenders more efficiently determine borrowers' creditworthiness, HUD-

28  FHA allows DELs to use an FHA-approved AUS to review loan applications. The AUS interfaces with

FHA's TOTAL Mortgage Scorecard ("TOTAL"). The AUS algorithmically analyzes the various data points and variables of the transaction and returns a credit recommendation of "accept"/"approve" or a "refer"/"caution."

37.     Because the AUS recommendation is entirely driven by the totality of the variables input by the DEL, no one variable alone will determine the outcome. Rather, the system looks to the interplay of the variables with each other in making its recommendation. Accordingly, the integrity of the value of each variable is absolutely necessary for the AUS to provide a meaningful recommendation. In other words, if the DEL inputs untruthful borrower information, such as inflated or unsubstantiated income, the AUS will be unable to accurately analyze the application, resulting in a false positive. Or, if the DEL falsely identifies atypical strengths in an application ("compensating factors") that are not properly documented or nonexistent, the AUS will over-rely on these and under-rely on traditional metrics like various debt-to-income ratios which would also result in a false positive.

38.     If the loan is rated "accept"/"approve," the DEL will be required to adhere to documentation standards that must be followed in order for the loan to be eligible for HUD-FHA insurance. The DEL must collect and inspect these documents and, using sound underwriting principles, verify the integrity of these documents. If a document does not comport with underwriting best practices or even HUD-FHA's minimum standards for integrity the DEL should discount it from the underwriting process.

39.     Further, if a document does not support a variable from the borrower's application, the variable must be removed from the underwriting process. For example, if a document does not adequately support the borrower's claimed commission income, that commission income must be removed from the application.

40.     In cases where a DEL uses an FHA-approved AUS, and the system rates a loan as an "accept" or "approve," the DEL must make the following certification on the form HUD-92900-A, in sum and substance:

> This mortgage was rated as an "accept" or "approve" by a FHA-approved automated underwriting system. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for

HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

41.     If the loan is rated "refer"/"caution," the loan must be manually underwritten by the DEL underwriter based on all current HUD-FHA guidelines and best practices of the mortgage underwriting industry.

42.     In cases where a DEL underwriter manually underwrites the loan, the underwriter must make the following certification on the form HUD-92900-A, in sum and substance:

> This mortgage was rated as a "refer" or "caution" by a FHA-approved automated underwriting system, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

43.     The certifications in HUD Handbook 4000.4, incorporated by reference in the certifications above, include the certification that the mortgage complies with HUD-FHA underwriting requirements contained in all outstanding HUD-FHA Handbooks and Mortgagee Letters.

44.     Absent a truthful loan application certification, a DEL is not entitled to endorse a particular loan for HUD-FHA insurance.

**B.      Defendants' Underwriting and False Loan Certifications on the Covered Transactions.**

45.     From September 12, 2007, until May 10, 2012, Reunion was unconditionally approved for participation in the HUD-FHA DEL Program as described above. Defendant David Thayer acting as President and Designated Broker, certified annually that Reunion was complying with HUD-FHA guidelines.

46.     Defendant Thayer provided annual certifications to HUD stating:

> I know or am in the position to know, whether the operations of the above-named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above-named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

9

47.     At the time of Reunion's withdrawal from the DEL program, on May 10, 2012, FHA had received claims for 116 loans endorsed by Reunion totaling over $21 million. Further, at that time there were 573 FHA insured loans endorsed by Defendants currently in default totaling almost $98 million.

48.     While unconditionally approved for participation in the DEL Program, Defendants endorsed the following Covered Transactions for HUD-FHA insurance: FHA Case Nos. 043-7533603, 042-8491871, 093-6480604, 042-08144426, 151-8357405, 043-7844332, 483-3929987, 421-4430394, 413-4874470, 411-4007716, 043-7511071, and 048-5356153.

49.     Each Covered Transaction at issue was either underwritten using an FHA-approved AUS program or manually underwritten by a Reunion, DEL-approved underwriter.

50.     In the case of the Covered Transactions underwritten using an AUS, a Reunion representative certified on HUD-92900-A to the integrity of the data supplied by Reunion to determine the quality of the loan and further certified that the mortgage is eligible for HUD-FHA mortgage insurance under the DEL program.

51.     In the case of the manually underwritten Covered Transaction (FHA Case No. 483-3929987), Reunion's DEL underwriter certified on HUD-92900-A to having personally reviewed the credit application and all associated documents and has used due diligence in underwriting the mortgage. The underwriter further certified to finding that the mortgage is eligible for HUD-FHA mortgage insurance under the DEL program.

52.     The United States alleges that the aforementioned certifications on HUD-92900-A are false because of Defendants' failures to even meet HUD-FHA's minimum underwriting standards and, as a result, the Government has incurred losses in connection with the Covered Transactions.

53.     All of the Covered Transactions at issue in this matter were insured through the HUD-FHA DEL program.

54.     For each loan, Defendants knowingly provided false statements to HUD-FHA when they either certified "to the integrity of the data supplied by the lender used to determine the quality of the loan" or when Reunion's DEL underwriter certified to having "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and hav[ing] used due diligence in underwriting the mortgage" and that the mortgage "is eligible for HUD mortgage insurance under the"

1   DEL program.

2       55.    Each of the Covered Transactions went into default.  Insurance claims were presented to

3   HUD-FHA, and HUD-FHA, in honor of its mortgage insurance commitments, paid the mortgage

4   insurance claims.

5                           **(FHA Case No. 042-8144426)**

6       56.    On November 28, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to

7   insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

8       57.    Defendants represented the borrower's qualifying income as $8,076; however, the

9   borrower's verified monthly income was $6,434.

10      58.    Defendants performed inadequate due diligence and improperly relied solely on the

11  $8,076 monthly income reported on the borrower's mortgage application even though Defendants'

12  verbal Verification of Employment ("VOE") confirmed the borrower earned $6,034.  Further, the

13  borrower's 2007 tax return showed annual wages of $70,132 or $5,844 per month.

14      59.    Defendants represented the borrower's payment-to-income ratio, also called the "front-

15  end" ratio as 26.85%, but the true ratio was 34%.

16      60.    Defendants represented the borrower's total debt-to-income ratio, also called the "back-

17  end" ratio as 43.64%, but the true ratio was 55%.

18      61.    Had Defendants followed HUD-FHA policies, the borrower would not have qualified for

19  the loan.

20      62.    These false statements were material to the AUS system's acceptance of this application

21  and the issuance of mortgage insurance by HUD-FHA.

22      63.    After the borrower defaulted on the loan, HUD-FHA received a mortgage insurance

23  claim in July 2010, and paid $78,477.89 pursuant to HUD-FHA's insurance obligations.

24                          **(FHA Case No. 042-8491871)**

25      64.    On August 11, 2009, Defendants endorsed this loan, thereby binding HUD-FHA to insure

26  it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

27      65.    Defendants improperly accepted the co-borrower's unsupported self-employment income

28  of $1,212 in violation of HUD-FHA guidelines.  Defendants performed inadequate due diligence and

improperly relied solely on the mortgage application which stated the co-borrowers line of employment was "golf caddy" for seven years; however, the borrowers' 2007 tax forms stated the co-borrower's self-employment was doing "odd jobs" and the 2008 tax forms stated self-employment was as a "part time Sherpa." In order to accept self-employment income, HUD-FHA requires, at a minimum, two years of successful self-employment in the same line of work. The driving factor the underwriter is required to look for is the stability of this income in the past to justify its continuance for the foreseeable future. Accordingly, the co-borrower's self-employment income must be removed from the application.

66.     Further, for self-employed borrowers HUD-FHA requires the underwriter to deduct business expenses from income and use only the profit or loss reported on line 12 of the borrower's tax return. However, Defendants failed to deduct these expenses from the co-borrower's income.

67.     Defendants' use of an improperly inflated income when calculating the qualifying ratios resulted in favorable ratios for the borrowers which falsely passed HUD-FHA's acceptable back-end ratios.

68.     Defendants represented the back-end ratio as 41%, but the true ratio was 46%.

69.     Had Defendants followed HUD-FHA policies, borrower would not have qualified for the loan.

70.     These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

71.     After the borrowers defaulted on the loan, HUD-FHA received a mortgage insurance claim in January 2011, and paid $72,644.52 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 043-7511071)**

72.     On June 13, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

73.     Defendants performed inadequate due diligence and improperly relied on the mortgage application that stated the co-borrower's monthly income was $815; however, had Defendants obtained the co-borrower's current pay stubs, as required by HUD-FHA, they would have calculated her monthly income as $438.

74.     Defendants represented the front-end ratio as 36.3% but, the true ratio was 39.24%.

75.     Defendants represented the back-end ratio as 55.9%, but the true ratio was 59.95%.

76.     To counter-balance the effect of these excessively high ratios, Defendants presented as compensating factors that the borrower was a minimal user of credit. However Defendants had in their possession a credit report that showed that borrower had six or more outstanding loans with a combined balance of $164,098.

77.     Further, Defendants ignored the negative indicator that the proposed housing expense of $2,047 was nearly twice the current housing expense of $1,150.

78.     Had Defendants followed HUD-FHA policies, the borrowers would not have qualified for the loan.

79.     These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

80.     After the borrowers defaulted on the loan, HUD-FHA received a mortgage insurance claim in March 2010, and paid $82,494.40 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 043-7533603)**

81.     On July 11, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

82.     Defendants falsely inflated both borrowers' incomes by solely relying on the values stated on the mortgage application that claimed the primary borrower's monthly income was $1,600 and the co-borrower's was $1,561. In fact, the primary borrower made $1,310 a month and the co-borrower made $986 a month.

83.     Defendants represented the front-end ratio as 36.48%, but the true ratio was 50.22%.

84.     Defendants represented the back-end ratio as 42.55%, but the true ratio was 58.58%.

85.     Defendants failed to provide any compensating factors as justification for these excessively high ratios. In fact, Defendants ignored the borrowers' lack of capacity to repay the mortgage by not taking into consideration the borrower's inconsistent work history. Specifically, the primary borrower did not have a two-year history of full-time employment in the same line of work. Further, the primary borrower had an undocumented five month gap in employment. Both of these factors, when combined with the true, lower income figures, would significantly weigh against the

13

1 | AUS's decision to accept the application.

2 |     86.    Defendants used false assets to qualify the borrowers. Defendants performed inadequate

3 | due diligence and improperly relied solely on the reported assets on the mortgage application that

4 | showed combined checking and savings assets of $2,922. However, the underwriter did not follow

5 | HUD-FHA guidelines and obtain borrowers' bank statements. Had the underwriter obtained these

6 | statements, it would have been known the borrowers had combined savings of only $112. This AUS

7 | variable's lack of integrity caused the system to provide a false approval.

8 |     87.    Had Defendants followed HUD-FHA policies, the borrowers would not have qualified

9 | for the loan.

10 |     88.    These false statements were material to the AUS system's acceptance of this application

11 | and the issuance of mortgage insurance by HUD-FHA.

12 |     89.    After the borrowers defaulted on the loan, HUD-FHA received mortgage insurance

13 | claims in October and December 2009, and paid $148,175.36 pursuant to HUD-FHA's insurance

14 | obligations.

15 | **(FHA Case No. 043-7844332)**

16 |     90.    On May 26, 2009, Defendants endorsed this loan, thereby binding HUD-FHA to insure it;

17 | however, the data Defendants supplied to the AUS lacked the necessary integrity.

18 |     91.    Defendants represented the borrower's base employment income as $4,869; however, the

19 | borrower's verified monthly income was $3,985.

20 |     92.    Defendants performed inadequate due diligence and improperly relied solely on the

21 | higher income amount stated on the mortgage application even though the VOE, the W-2s and the tax

22 | returns indicated a lower amount.

23 |     93.    Defendants represented the front-end ratio as 39.1%, but the true ratio was 48.59%.

24 |     94.    Defendants represented the back-end ratio as 48%, but the true ratio was 60%.

25 |     95.    Further weighing against this loan was that it was a cash-out refinance with nearly 25%

26 | of the proceeds being used to pay-off existing debt. This is negative because, combined with the other

27 | factors, it indicates the borrower's inability to manage debt.  Further, the subject property was in an

28 | economically depressed area which would indicate the property may not be able to maintain its value.

14

96.     Had Defendants followed HUD-FHA policies, the borrower would not have qualified for the loan.

97.     These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

98.     After the borrower defaulted on the loan, HUD-FHA received mortgage insurance claims in October 2010 and March 2011, and paid $270,864.72 pursuant to HUD-FHA's insurance obligations.

## (FHA Case No. 048-5356153)

99.     On August 31, 2009, Defendants endorsed this loan, thereby binding HUD-FHA to insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

100.    Defendants omitted a debt of $4,889, representing only $352 in monthly payment obligations, from the underwriting analysis. In fact, the AUS findings required evidence of this debt's payoff prior to funding.  However, because it was marked for payoff prior to funding it was not included in the underwriting analysis and thus, the underwriter represented this borrower's debt as lower than it actually was.

101.    Defendants represented the back-end ratio as 55.15%, but the true ratio was 61.81%.

102.    Had Defendants followed HUD-FHA policies, the borrower would not have qualified for the loan.

103.    These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

104.    After the borrower defaulted on the loan, HUD-FHA received a mortgage insurance claim in January 2011, and paid $44,776.08 pursuant to HUD's insurance obligations.

## (FHA Case No. 093-6480604)

105.    On October 29, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

106.    The borrower's income and employment were not properly verified by the underwriter as required by HUD-FHA underwriting guidelines. HUD-FHA's underwriting guidelines require a borrower's most recent year-to-date pay stub documenting one full month's earnings; however, Defendants documented only one pay stub showing less than one full month.  Further, the pay stub

1    identified the income as commission and not base pay.  If commission income is used to qualify it must

2    be documented for two years and be reasonably expected to continue.  Further, the VOE did not clearly

3    identify the borrower's income but commented "per pay stub," which showed $2,486 which was

4    considerably lower than the $3,203 on the mortgage application.

5         107.    In 2006, the borrower's income was 100% commission from the real estate business.  In

6    2007, the borrower continued with his real estate business but experienced a dramatic decline in sales.

7    In 2007, the borrower began working in the trucking business and, based on the pay stub provided,

8    100% of his income from this business was commission.  For 2008, the borrower provided no income

9    documentation from his real estate business.

10        108.    HUD-FHA guidelines state "[c]ommission income showing a decrease from one year to

11   the next requires significant compensating factors before a borrower can be approved for the loan."  The

12   borrower's real estate income decreased by 73% from 2006 to 2007 and was non-existent in 2008,

13   rendering any real estate related income unusable.

14        109.    Depending on when in 2007 the borrower transitioned from real estate to trucking, his

15   2008 commission when he applied for the mortgage was for either less than one year or greater than one

16   year but less than two years.

17        110.    If the borrower had been in the trucking business for less than one year, then, according

18   to HUD guidelines, his income from that business could not be considered in approving the loan.

19        111.    If the borrower had been in the trucking business for more than one year but less than two

20   years his income from that business could only be used if the "underwriter can: a) document the

21   likelihood that the income will continue, and b) soundly rationalize accepting the commission income."

22   However, the underwriter made no such documentation or rationalization.  Undermining the ability to

23   use his trucking income is the fact that within the last two years he had completely changed business

24   from real estate to trucking.  Common industry practice and established underwriting policy requires, at

25   a minimum, commission income for two years from the same line of work and more prudently from the

26   same employer.

27        112.    Setting aside the fact that the borrower's commission income was not documented or

28   even usable, accepting the amount on the pay stub provided ($2,486) rather than what the borrower

16

1  provided on the mortgage application would result in a back-end ratio of 63% which is considerably

2  higher than the 56% Defendants represented as true.

3      113.    Even assuming the borrower's income could be used at all, Defendants failed to properly

4  calculate his income. HUD-FHA guidelines require that for borrowers making 25% of more of their

5  income from commissions, unreimbursed business expenses must be deducted from their income. Here,

6  the borrower's income was at all times 100% commission. The 2007 tax return Schedule C showed

7  $19,350 of unreimbursed business expenses leaving a net income for the year of $7,550. The

8  borrower's 2006 Schedule C showed $42,704 of unreimbursed business expenses showing a net income

9  of $27,968. Further, no due diligence was done to understand and account for the borrower's trucking-

10  related business expenses. Had these business expenses been deducted from the borrower's income the

11  front-end and back-end ratios would have been significantly higher still.

12      114.    Further, Defendants failed to properly verify the borrower's current employment. The

13  VOE in the file indicates a start date of 09/17/08; which is clearly false considering the pay stub

14  provided by the borrower was dated 08/07/08. An accurate start date is critical to the underwriting of

15  any loan using commission income or other non-base pay.

16      115.    Defendants ignored the borrowers' poor credit history. In 2003, the co-borrower had her

17  chapter 7 bankruptcy discharged. While HUD-FHA only requires, at a minimum, two years to have

18  passed since the bankruptcy, HUD-FHA also requires the borrower to reestablish good credit or choose

19  to not incur new obligations. However, the borrowers amassed 12 new loans in those five years totaling

20  over $78,000 in new debt. This shows Defendants' poor due diligence in assessing the borrowers'

21  willingness to repay this loan.

22      116.    Had Defendants followed HUD-FHA policies, the borrowers would not have qualified

23  for the loan.

24      117.    These false statements were material to the AUS system's acceptance of this application

25  and the issuance of mortgage insurance by HUD-FHA.

26      118.    After the borrowers defaulted on the loan, HUD-FHA received a mortgage insurance

27  claim in October 2010, and paid $246,240.51 pursuant to HUD-FHA's insurance obligations.

28      //

17

**(FHA Case No. 151-8357405)**

119.   On May 27, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

120.   The borrower's mortgage application was dated May 6, 2008.

121.   To verify income and employment, HUD-FHA requires the most recent full month's pay stub showing, among other things, current and year-to-date earnings. According to HUD-FHA guidelines, "most recent" means the most recent available at the time of application. In this case, the most recent full month's pay stubs would have included pay through April 30, 2008. However, Defendants only collected pay stubs through March 27, 2008. Had Defendants collected the most recent pay stubs, through the end of April, 2008, it would have been clear that the borrower was currently on leave and not earning overtime income.

122.   Defendants were in possession of a note from the borrower's doctor dated March 27, 2008, prescribing leave from work to relieve stress, anxiety, and panic attacks.

123.   This combination of the lack of April pay stubs and the March doctor's note is evidence that the borrower was experiencing a significant change in income and the stability of future overtime income was seriously in question.

124.   The AUS findings required that if overtime income was used to qualify the borrower, it needed to be verified for two years and have a reasonable expectation of continuing. However, there was no reasonable expectation the borrower's overtime would continue.

125.   Defendants represented the front-end ratio as 29.63%, but the true ratio was 43.8%.

126.   Defendants represented the back-end ratio as 29.87%, but the true ratio was 44.2%.

127.   Had Defendants followed HUD-FHA policies, the borrower would not have qualified for the loan. In fact, the stated reason for swift delinquency was the borrower's unemployment due to the medical leave that was documented at the time of the borrower's application.

128.   These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

129.   After the borrower defaulted on the loan, HUD-FHA received mortgage insurance claims in October and December 2009, and paid $189,408.73 pursuant to HUD-FHA's insurance obligations.

18

**(FHA Case No. 411-4007716)**

130.   On January 11, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

131.   The borrowers did not have sufficient funds to close the loan as required by HUD-FHA. The loan required a cash investment of $2,153; however, the borrowers' bank records showed a balance at the time of the loan of only $987.  Defendants failed to account for the shortfall or provide any documentation showing the source of the required funds.

132.   Defendants omitted over $32,000 in liabilities, representing $855 of monthly obligations, from the underwriting analysis during liability reconciliation without documentation that supported the omission.

133.   Defendants calculated the primary borrower's monthly income by improperly including unsupported overtime pay.  Despite an AUS requirement that overtime could only be included if verified for the past two years with the same employer, Defendants included $1,136 of year-to-date overtime, which inflated the primary borrower's monthly income by $113.

134.   Defendants calculated the co-borrower's monthly income by improperly including unsupported commission income.  If a borrower's income is 25% or more from commission, the AUS requires the commission to be verified using the past two years' tax returns.   The mortgage application indicated 100% of the co-borrower's income was from commissions.  The borrowers' previous two years tax returns supported monthly commission of $2,468; however, Defendants only averaged the current year's commission income.  This overstated the co-borrower's monthly income by $522.

135.   The borrowers' overstated income and understated liabilities led to falsely favorable qualifying ratios.

136.   Defendants represented the back-end ratio as 51%, but the true ratio was 74%.

137.   Had Defendants followed HUD-FHA policies, the borrowers would not have qualified for the loan.

138.   These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

139.   After the borrowers defaulted on the loan, HUD-FHA received a mortgage insurance

19

claim in May 2009, and paid $61,095.39 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 413-4874470)**

140.    On August 7, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

141.    Defendants performed inadequate due diligence and improperly relied on the mortgage application when it included $584 of retirement income. The only verification of this income was a letter from the Ohio Public Employees Retirement system which was addressed to the co-borrower and another individual stating payments began on January 1, 1998. However, at that time the co-borrower was eleven years old which would ordinarily make the co-borrower ineligible to receive retirement benefits. Further, no effort was made to document any relationship between the co-borrower and the retiree receiving the benefits in order to explain including the retirement income in the co-borrower's total income.

142.    Defendants calculated the primary borrower's monthly income by improperly including unsupported overtime pay. Despite an AUS requirement that overtime could only be included if verified for the past two years with the same employer, Defendants included unsupported overtime which inflated the primary borrower's monthly income by $848.

143.    Defendants represented the front-end ratio as 26%, but the true ratio was 40%.

144.    Defendants represented the back-end ratio as 47% but the true ratio was 72%.

145.    Had Defendants followed HUD-FHA policies, the borrowers would not have qualified for the loan.

146.    These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

147.    After the borrowers defaulted on the loan, HUD-FHA received mortgage insurance claims in May 2010 and July 2010, and paid $154,969.81 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 421-4430394)**

148.    On August 28, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to insure it; however, the data Defendants supplied to the AUS lacked the necessary integrity.

1    149.    The borrowers applied for this loan on July 25, 2008. However, on June 18, 2008, the

2    co-borrower terminated her employment with Connor's Drilling. AUS findings require the most recent

3    year-to-date pay stub, which would have been through June 30, 2008; however, Defendants only

4    considered pay stubs through the end of April, 2008, which were nearly three-months old at the time of

5    the application. Had Defendants followed these guidelines and obtained pay stubs through the end of

6    June, 2008, it would have known that the co-borrower's employment had been terminated.

7    150.    Further, Defendants' VOE contradicted the mortgage application. The VOE stated that

8    the co-borrower worked for Schlumberger; however, the mortgage application stated she worked for

9    Connor's Drilling.

10   151.    Defendants falsely inflated the primary borrowers' income by solely relying on the values

11   stated on the mortgage application that claimed his monthly income was $2,987. However, his true

12   income was $2,080 a month.

13   152.    Defendants represented the front-end ratio as 23.19%, but the true ratio was 51.63%.

14   153.    Defendants represented the back-end ratio as 40%, but the true ratio was 89.7%.

15   154.    Had Defendants followed HUD-FHA policies, the borrowers would not have qualified

16   for the loan.

17   155.    These false statements were material to the AUS system's acceptance of this application

18   and the issuance of mortgage insurance by HUD-FHA.

19   156.    After the borrowers defaulted on the loan, HUD-FHA received mortgage insurance

20   claims in April and June 18, 2010, and paid $143,629.28 pursuant to HUD-FHA's insurance obligations.

21                                    **(FHA Case No. 483-3929987)**

22   157.    On August 8, 2008, Defendants endorsed this loan, thereby binding HUD-FHA to insure

23   it.

24   158.    Initially, this loan was processed under the AUS; however, AUS finding #4 red flagged

25   this loan because of "an unusually high number of submissions. Excessive submissions can indicate

26   improper manipulation of the loan application data." Accordingly, this loan was referred to the DEL-

27   qualified underwriter for manual underwriting "to ensure accuracy."

28   159.    Nevertheless, Defendants' DEL-qualified underwriter approved this loan for HUD-FHA

21

1 insurance.

2      160.    Defendants did not obtain the borrower's most recent pay stub and appropriate VOE as

3 required by HUD-FHA's underwriting guidelines.

4      161.    Defendants falsely identified the borrower's position as "shop supervisor;" however, the

5 VOE from the employer identified the borrower's position as that of "shop tech."

6      162.    Defendants relied on three incomplete pay stubs provided by the borrower. The pay

7 stubs did not identify the employer, misidentified the borrower's position as shop supervisor, and did not

8 clearly identify the borrower's salary or the reasonable continuance of overtime income. In fact, the

9 three pay stubs showed weekly hours of 69.2, 50.1, and 40.8, which showed that overtime was actually

10 inconsistent.

11      163.    To include overtime, AUS findings require two years' documentation supporting the

12 overtime and a reasonable expectation it will continue; however, Defendants obtained no documentation

13 beyond the three incomplete pay stubs.

14      164.    Defendants represented the front-end ratio as 22.2%, but the true ratio was 35.96%—

15 more than 4% higher than the maximum allowed for manually underwritten loans.

16      165.    Defendants represented the back-end ratio as 43%, but the true ratio was 54%—11%

17 higher than the maximum ratio allowed for manually underwritten loans.

18      166.    Had Defendants followed HUD-FHA policies, the borrower would not have qualified for

19 the loan.

20      167.    These false statements were material to the issuance of mortgage insurance by HUD-

21 FHA.

22      168.    After the borrower defaulted on the loan, HUD-FHA received mortgage insurance claims

23 in July and September 2009, and paid $137,731.20 pursuant to HUD-FHA's insurance obligations.

24 **FIRST CAUSE OF ACTION**

25 **False Claims Act, 31 U.S.C. § 3729(a)(1) (2006) and, as amended, 31 U.S.C. § 3729(a)(1)(A)**

26 **Presenting or Causing False Claims to Be Presented (Reckless Underwriting)**

27      169.    The Government incorporates by reference paragraphs 1 through 168 as if set forth fully

28 herein.

170.   By virtue of the acts described above and in violation of 31 U.S.C. § 3729(a)(1) (2006) , and, as amended, 31 U.S.C. § 3729(a)(1)(A), Defendants engaged in reckless underwriting of the Covered Transactions.

171.   The Covered Transactions did not meet the HUD-FHA loan parameters, contained unacceptable risk, and were ineligible for HUD-FHA insurance.  Nonetheless, Defendants certified each of the Covered Transactions for insurance, thereby falsely certifying that the Covered Transactions were eligible for HUD-FHA insurance.

172.   Defendants knowingly, or acting with deliberate ignorance and or/reckless disregard for the truth, caused false or fraudulent claims for HUD-FHA insurance to be presented to an officer or employee of the United States Government by submitting false loan-level certifications for the Covered Transactions to HUD-FHA in order to get HUD-FHA to endorse these mortgages that did not meet HUD requirements and contained unacceptable risk for HUD-FHA insurance.

173.   Defendants knowingly, or acting with deliberate ignorance and or/reckless disregard for the truth, presented to an officer or employee of the Government false or fraudulent claims for payment when it submitted claims for HUD-FHA insurance for the defaulted Covered Transactions that Defendants falsely certified were eligible for HUD-FHA insurance.

174.   HUD-FHA paid insurance claims, incurred losses, on these Covered Transactions that Defendants falsely certified as eligible for HUD-FHA insurance.

175.   By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each transaction.

**SECOND CAUSE OF ACTION**

**False Claims Act, 31 U.S.C. § 3729(a)(2) (2006), and, as amended, § 3729(a)(1)(B)**

**Use of False Statements in Support of False Claims (Reckless Underwriting)**

176.   The Government incorporates by reference paragraphs 1 through 168 as if set forth fully herein.

177.   By virtue of the acts described above and in violation of 31 U.S.C. § 3729(a)(2) (2006), and, as amended, § 3729(a)(1)(B), Defendants knowingly, or acting with deliberate ignorance and

23

or/reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims with respect to the Covered Transactions that Defendants falsely certified were eligible for HUD-FHA insurance. Specifically, Defendants knowingly submitted false HUD-FHA loan certifications to HUD-FHA, representing, inter alia, that each loan was eligible for HUD-FHA mortgage insurance under the DEL program.

178.   Defendants submitted false loan certifications to induce HUD-FHA to endorse Covered Transactions for insurance and to get HUD-FHA to pay false insurance claims when the Covered transactions defaulted.

179.   HUD paid insurance claims, incurred losses, on these Covered Transactions that Defendants falsely certified as eligible for HUD-FHA insurance.

180.   By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each transaction.

## THIRD CAUSE OF ACTION

### Negligence

181.   The Government incorporates by reference paragraphs 1 through 168 as if set forth fully herein.

182.   Defendants owed the Government a reasonable duty of care and a duty to conduct due diligence.

183.   As set forth above, Defendants breached their duties to the Government.

184.   As a result of Defendants' breaches of their duties, the Government paid insurance claims, and incurred losses, relating to HUD-FHA insured mortgages endorsed by Defendants.

185.   By virtue of the above, the Government is entitled to compensatory damages, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

186.   The Government incorporates by reference paragraphs 1 through 168 as if set forth fully herein.

187.    By virtue of the acts described above Defendants were unjustly enriched by HUD's payment of the claims for HUD-FHA insurance with respect to the default of the Covered Transactions that Defendants falsely certified were eligible for insurance.

188.    By reason of payments HUD-FHA made to Defendants, Defendants were unjustly enriched. The circumstances of Defendants' receipt of those payments are such that in equity and good conscience Defendants should not retain these payments, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**Payment by Mistake**

189.    The Government incorporates by reference paragraphs 1 through 168 as if set forth fully herein.

190.    The United States seeks relief against Defendants to recover payments made under mistake of fact.

191.    On information and belief, Defendants submitted, and HUD-FHA paid, $1,630,527.89 in insurance claims on the defaulted Covered Transactions that Defendants falsely certified were eligible for insurance.

192.    HUD-FHA made payments to Defendants under the mistaken belief that the defaulted Covered Transactions had been eligible for HUD-FHA insurance.

193.    By reason of the foregoing, the United States has been damaged in a substantial amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**Breach of Fiduciary Duty**

194.    The Government incorporates by reference paragraphs 1 through 168 as if set forth fully herein.

195.    HUD-FHA and Defendants have a special relationship of trust and confidence by virtue of Reunion's participation in the DEL program. The DEL empowered Defendants to obligate HUD-FHA to insure mortgages it issued without any independent HUD-FHA review. Therefore, Defendants were in a position of advantage or superiority in relation to HUD-FHA and is a fiduciary to HUD-FHA.

196.    As a fiduciary, Defendants had a duty to act for, and give advice to, the Government for

25

1  benefit of the Government as to whether mortgages should be insured by HUD-FHA under the DEL

2  program.

3       197.    As a fiduciary, Defendants had an obligation to act in the utmost good faith, candor,

4  honesty, integrity, fairness, undivided loyalty, and fidelity in its dealings with the Government.

5       198.    As set forth above, Defendants breached their fiduciary duty to HUD-FHA.

6       199.    As a result of Defendants' breach of fiduciary duty, HUD-FHA has paid insurance claims

7  and incurred losses.

8       200.    By reason of the foregoing, the Government is entitled to compensatory damages in an

9  amount to be determined at trial.

10  **PRAYER FOR RELIEF**

11       WHEREFORE, the United States demands judgment against Defendants as follows:

12      a)    On Counts One and Two (False Claims Act), judgment for the Government, treble the

13  Government's damages, and civil penalties for the maximum amount allowed by law;

14      b)    On Counts Three, Four, Five, and Sixth (Negligence, Unjust Enrichment, Payment by

15  Mistake and Breach of Fiduciary Duty), judgment for the Government and compensatory damages

16  including prejudgment interest, making the Government whole for past losses;

17      c)    For an award of costs pursuant to 31 U.S.C. § 3729(a) and

18      d)    For an award of any further relief as the Court shall deem just and proper.

19

20

21  Dated: May 22, 2013                 Respectfully submitted,

22                                 MELINDA HAAG

23                                 United States Attorney

24

25                                 ILA C. DEISS

26                                 Assistant United States Attorney

27                                 Attorneys for United States of America

28

26