1  MELINDA HAAG (CABN 132612)
United States Attorney

2

3  ALEX G. TSE (CABN 152348)
Chief, Civil Division

4  ILA C. DEISS (NYBN 3052909)
Assistant United States Attorney

5

6         450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

7         Telephone: (415) 436-7124
FAX: (415) 436-7169

7         ila.deiss@usdoj.gov

8
Attorneys for United States of America

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                   OAKLAND DIVISION

13

14

15  UNITED STATES OF AMERICA,                )  CIVIL ACTION NO. ~~CV 13-2340 SBA~~
                                             )
16          Plaintiff,                       )
                                             )  **SECOND AMENDED COMPLAINT OF THE**
17      v.                                   )  **UNITED STATES OF AMERICA**
                                             )
18  REUNION MORTGAGE, INC.,                  )
                                             )  **<u>Jury Trial Demanded</u>**
19  DAVID THAYER, and R. KENT HARVEY         )
                                             )
20          Defendants.                      )

21  _____

22          The United States of America (the "United States" or the "Government"), by its attorney,

23  Melinda Haag, United States Attorney for the Northern District of California, brings this action against

24  Reunion Mortgage, Inc. ("Reunion"), its Principal Owner, Designated Broker and President, David

25  Thayer, ("Thayer"), and its Owner and Vice President, R. Kent Harvey (collectively, "Defendants"),

26  alleging upon information and belief as follows:

27                            **INTRODUCTION**

28          1.      This is a civil fraud action by the United States against Reunion to recover treble

Second Amended Complaint CV 13-2340 SBA

damages and civil penalties under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729 *et seq*., and common-law damages arising from fraud on the United States Department of Housing and Urban Development ("HUD") in connection with Reunion's residential mortgage lending business.

2.      As one of its functions, HUD, through its Federal Housing Administration ("FHA"), insures lenders against losses on mortgage loans to home buyers pursuant to the provisions of the National Housing Act.  12 U.S.C. §§ 1701-1701z-17 (2006).  Under HUD-FHA's mortgage insurance program, if a homeowner fails to make payments on the mortgage loan and the mortgage holder forecloses on the property, HUD-FHA will pay the mortgage holder the balance of the loan (together with interest due and other costs) and assume ownership and possession of the property.

3.      As set forth more fully below, from 2007 to2012, Reunion participated in FHA's Direct Endorsement Lender Program ("DEL").

4.      At the time of Reunion's withdrawal from the DEL Program, on May 10, 2012, HUD-FHA had received insurance claims for 116 defaulted loans certified by Reunion totaling over $21 million.  This action focuses on twelve of those loans for which claims were filed by Reunion and paid by HUD-FHA.

5.      Under FHA's DEL Program, HUD-FHA insured twelve (12) materially deficient loans that Reunion employees individually certified to HUD-FHA met the requirements for proper underwriting, when they had not and were ineligible for FHA insurance.  The twelve loans will be referred to herein as the "Covered Transactions."

6.      As a result of Reunion's annual certifications of compliance and false individual loan certifications of eligibility that induced HUD-FHA to insure the Covered Transactions, between 2009 and January 2011, HUD-FHA paid $1,630,527.89 in insurance claims on the defaulted Covered Transactions.

7.      This is also an action against Reunion, Thayer and Harvey, on the grounds that between December 2011 and April 2012, Reunion transferred to Thayer and Harvey $1,775,783.50, in violation of the Federal Debt Collection Procedure Act, 28 U.S.C. § 3304.

Second Amended Complaint CV 13-2340 SBA

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331, 1345.

9.      Defendant Reunion is a California corporation with its principle place of business in this District and is subject to the jurisdiction of this Court.

10.     Defendant David Thayer resides in this District.

11.     Defendant R. Kent Harvey resides in this District.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b).

**THE PARTIES**

13.     At all times material to this civil action, HUD-FHA was an agency and instrumentality of Plaintiff United States and its activities, operations, and contracts were paid from Federal funds.

14.     Defendant Reunion, a mortgage lender, is a California corporation with its principal place of business in Milpitas, California.

15.     Defendant David Thayer was at all relevant times the President, Director, and principal co-owner of Reunion and resides in Pleasanton, California.

16.     Defendant R. Kent Harvey was at all relevant times the Senior Vice President and co-owner of Reunion and resides in Los Altos, California.

17.     Further, at all times relevant, and in order to participate in the DEL Program, Defendant Reunion identified Thayer as its designated principal officer/broker with the responsibility for supervision and control of its employees and Thayer acknowledged and accepted this responsibility.

**THE FALSE CLAIMS ACT**

18.     The FCA provides liability for any person (i) who "knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B).  The FCA further provides that any person who violates the Act: "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."

1    31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

2        19.    Under California law, the solicitation of residential mortgages is regulated by the

3    California Department of Real Estate ("CA DRE").   Only CA DRE licensed brokers or CA DRE

4    licensed agents acting under the supervision of a broker may engage in the business of residential

5    mortgage loan solicitation.

6        20.    Under California law, a corporation may hold a real estate broker's license and at all

7    times relevant to this complaint, Reunion Mortgage, Inc., was licensed with the CA DRE as a real estate

8    broker.

9

10       21.    Under California law, a corporate broker must designate an officer as the broker for the

11   corporation.  A California corporate real estate broker operates only through and because of the license

12   of its designated officer.

13       22.    Under California law, the corporation's designated officer/broker "shall be responsible

14   for the supervision and control of the activities conducted on behalf of the corporation by its officers and

15   employees necessary to secure full compliance with the provisions of this division."  Cal. Bus. & Prof.

16

17   Code § 10159.2(a).

18                              **FACTUAL BACKGROUND**

19       **A.    FHA Direct Endorsement Lender Program Overview**

20       23.    HUD-FHA mortgage insurance programs help low- and moderate-income families

21   become homeowners by lowering down payment requirements, some closing costs, and qualifying

22   criteria.   By protecting lenders against default on mortgages, HUD-FHA mortgage insurance

23   encourages lenders to make loans to otherwise creditworthy borrowers that might not qualify under

24   conventional underwriting requirements.

25       24.    To assist as many qualified homeowners as possible, and to provide maximum economic

26   opportunities to lenders interested in obtaining HUD-FHA insurance on mortgages loans they make,

27   FHA operates the DEL program.  The DEL program grants participating lenders in the private sector the

28   authority to endorse mortgages that are qualified for HUD-FHA insurance.  In reviewing mortgages for

Second Amended Complaint CV 13-2340 SBA

1   eligibility for HUD-FHA insurance, DELs are entrusted with safeguarding the public from taking on

2   risks that exceed statutory, regulatory and programmatic limits.  DELs act as fiduciaries of HUD-FHA

3   in underwriting mortgages and endorsing them for HUD-FHA insurance.

4       25.     Once qualified as a DEL, the DEL is responsible for all aspects of the mortgage

5   application, the property analysis, and the underwriting of the mortgage.

6       26.     To obtain and maintain DEL status, a corporate officer and principal owner with

7   authority legally bind the mortgagee must submit an annual certification to HUD-FHA as follows:

8           I know or am in the position to know, whether the operations of the above-named
            mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify
9           that to the best of my knowledge, the above-named mortgagee conforms to all
            HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the
10          above-named mortgagee is fully responsible for all actions of its employees
            including those of its HUD-FHA approved branch offices.
11

12      27.     The annual certification requires compliance with the basic eligibility requirements for

13  DELs, which includes compliance with the mandatory HUD-FHA rules concerning due diligence in

14  underwriting and the implementation of a mandatory quality control plan.    The annual certification

15  requires mortgagees to certify to the accuracy of each of the statements found in the certification.

16  Certification of these statements is required to ensure that mortgagees provide FHA with the most

17  current information about their institution and its compliance with all applicable laws for the fiscal year

18  in which the mortgagee is renewing its FHA approval status.  Consequently, a mortgagee's principal

19  owner or corporate officer's online annual certification covers the period for the fiscal year the

20  mortgagee is recertifying.  If a mortgagee's principal owner or corporate officer is not sure whether one

21  or more of the statements comprising the online annual certification is accurate for their institution, then

22  the "Unable to Certify" box must be checked.  *See* Mortgagee Letter 2009-25.

23      28.     To qualify for HUD-FHA mortgage insurance, a mortgage must meet all of the applicable

24  HUD-FHA requirements.  Those requirements relate to, among other things, the adequacy of the

25  borrower's income to meet the mortgage payments in addition to other financial obligations, the

26  borrower's creditworthiness, and the borrower's available cash to close the transaction and that amount

27  in light of the borrower's savings history.

28      29.     On a mortgage-by-mortgage basis, HUD-FHA requires DELs to conduct due diligence to

Second Amended Complaint CV 13-2340 SBA

1   ensure that each mortgage is eligible for HUD-FHA insurance as set forth in HUD-FHA rules.  These

2   rules exist to prevent HUD-FHA from insuring mortgages that exceed the risk levels set by statute and

3   regulations.  A DEL must assure HUD-FHA that every endorsed mortgage meets all HUD-FHA rules.

4   HUD-FHA requires the DEL to certify, for each mortgage the lender endorses, that the lender has

5   conducted due diligence in accordance with all HUD-FHA rules and to the integrity of the data and

6   documentation used to endorse the loan.

7        30.    The DEL Program generally works as follows: The DEL originates a proposed loan or, in

8   some instances, acts as a sponsoring lender by underwriting and funding proposed mortgages originated

9   by other FHA-approved lenders known as correspondents or third-party originators.  In either case, the

10  DEL ultimately reviews and is responsible for the proposed mortgage.  The borrower, along with the

11  DEL's representative, completes the loan application.  A loan officer collects all supporting

12  documentation from the borrower and submits the application and documentation to the DEL.  A

13  professional underwriter employed by the DEL performs a mortgage credit analysis to determine the

14  borrower's ability and willingness to repay the mortgage debt.  The DEL's underwriter makes the

15  underwriting decision as to whether the mortgage may be approved for HUD-FHA insurance or not,

16  according to HUD-FHA rules.  This process is referred to as "manual underwriting."  As described

17  further below, the DEL may also use an FHA-approved automated underwriting system ("AUS") to

18  analyze the borrower's creditworthiness.  If the DEL has decided that the mortgage may be approved for

19  HUD-FHA insurance in accordance with HUD-FHA rules, the DEL funds the loan.  Thereafter, the DEL

20  certifies that the mortgage qualifies for HUD-FHA insurance.  FHA endorses the loan on the basis of the

21  DEL's certification and provides the DEL with a mortgage insurance certificate.

22       31.    Regardless of whether the loan is manually underwritten or underwritten with the

23  assistance of an AUS, the DEL is responsible for all aspects of the mortgage application, the property

24  analysis, and the underwriting of the mortgage.  HUD-FHA endorses mortgages in reliance upon the

25  DEL's certifications that the mortgages are eligible for HUD-FHA insurance.  Significantly, DELs

26  obligate HUD-FHA without prior independent HUD-FHA review.

27       32.    HUD-FHA grants DEL authority to the lender, not any individual underwriters.

28  However, to qualify for HUD-FHA approval as a DEL, a lender must have a qualified underwriter on

staff.  The underwriter's responsibilities are critical elements of the DEL Program, and each DEL must certify that its underwriters meet HUD-FHA qualifications.

33.     An underwriter must be a full-time employee of the mortgage lender and must either be a corporate officer with signatory authority or otherwise be authorized to bind the mortgage lender in matters involving origination of mortgage loans.  HUD Handbook 4060.1 REV-2.  An underwriter must also be a reliable and responsible professional who is skilled in mortgage evaluation and able to demonstrate knowledge and experience regarding principles of mortgage underwriting.

34.     "All employees who will sign applications for mortgage insurance on behalf of the mortgagee or report loans for insurance shall be corporate officer or shall otherwise be authorized to bind the lender or mortgagee in the origination transaction."  24 C.F.R. § 202.5(c).

35.     HUD-FHA's DEL Code of Ethics requires the lender to conduct its business operations in accordance with accepted sound mortgage lending practices, ethics, standards, and all federal and state laws applicable to mortgage banking.  See HUD Handbook 4155.2.

36.     An underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures."  24 C.F.R. § 203.5(d).

37.     HUD-FHA relies on DELs to conduct due diligence on loans originated under the DEL Program.  The purposes of due diligence include determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the risk of default and collection difficulties.  *See id.*  Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, and cash to close.

38.     In all cases, a DEL owes HUD-FHA the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."  24 C.F.R. § 203.5(c)).

39.     HUD-FHA has set specific rules for due diligence predicated on sound underwriting principles. In particular, HUD-FHA requires DELs to be familiar with, and to comply with, governing

Second Amended Complaint CV 13-2340 SBA

HUD-FHA Handbooks and Mortgagee Letters, which provide detailed processing instructions to DELs. These materials specify the minimum due diligence requirements with which DELs must comply.

40.     With respect to ensuring that borrowers have sufficient credit, a DEL must comply with governing HUD-FHA Handbooks, such as HUD 4155.1, and evaluate whether a borrower has the ability and willingness to repay the mortgage debt.  HUD-FHA has informed DELs that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

41.     To properly evaluate a borrower's creditworthiness, a DEL must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for any gaps in employment; document any gift funds; calculate debt ratios and compare those ratios to the fixed ratios set by HUD-FHA rules; and consider and document any compensating factors permitting deviations from those ratios.

42.     In order to help lenders more efficiently determine borrowers' creditworthiness, HUD-FHA allows DELs to use an FHA-approved AUS to review loan applications.  The AUS interfaces with FHA's TOTAL Mortgage Scorecard ("TOTAL").  The AUS algorithmically analyzes the various data points and variables of the transaction and returns a credit recommendation of "accept"/"approve" or a "refer"/"caution."

43.     Because the AUS recommendation is entirely driven by the totality of the variables input by the DEL, no one variable alone will determine the outcome.  Rather, the system looks to the interplay of the variables with each other in making its recommendation.  Accordingly, the integrity of the value of each variable is absolutely necessary for the AUS to provide a meaningful recommendation.  In other words, if the DEL inputs untruthful borrower information, such as inflated or unsubstantiated income, the AUS will be unable to accurately analyze the application, resulting in a false positive.  Or, if the DEL falsely identifies atypical strengths in an application, such as a high amount of reserves funds that are not properly documented or nonexistent, the AUS will over-rely on these and under-rely on traditional metrics like various debt-to-income ratios which would also result in a false positive.

44.     If the loan is rated "accept"/"approve," the DEL will be required to adhere to documentation standards that must be followed in order for the loan to be eligible for HUD-FHA insurance.  The DEL must collect and inspect these documents and, using sound underwriting principles, verify the integrity of these documents.  If a document does not comport with underwriting best practices or even HUD-FHA's minimum standards for integrity the DEL should discount it from the underwriting process.

45.     Further, if a document does not support a variable from the borrower's application, the variable must be removed from the underwriting process.  For example, if a document does not adequately support the borrower's claimed commission income, that commission income must be removed from the application.

46.     In cases where a DEL uses an FHA-approved AUS, and the system rates a loan as an "accept" or "approve," the DEL must make the following certification on the form HUD-92900-A, in sum and substance:

> This mortgage was rated as an "accept" or "approve" by a FHA-approved automated underwriting system. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal  (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance  under the Direct Endorsement program.  I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

47.     If the loan is rated "refer"/"caution," the loan must be manually underwritten by the DEL underwriter based on all current HUD-FHA guidelines and best practices of the mortgage underwriting industry.

48.     In cases where a DEL underwriter manually underwrites the loan, the underwriter must make the following certification on the form HUD-92900-A, in sum and substance:

> This mortgage was rated as a "refer" or "caution" by a FHA-approved automated underwriting system, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

Second Amended Complaint CV 13-2340 SBA

49.     The certifications in HUD Handbook 4000.4, incorporated by reference in the certifications above, include the certification that the mortgage complies with HUD-FHA underwriting requirements contained in all applicable HUD-FHA Handbooks and Mortgagee Letters.

50.     Absent a truthful loan application certification, a DEL is not entitled to approve a particular loan for HUD-FHA insurance.  Once a DEL, HUD relies on each individual loan certification to endorse the loan and provide the lender with an FHA mortgage insurance certificate.  Once a loan is endorsed for insurance, the loan receives a unique FHA case number.

**B.     Reunion's Underwriting and False Loan Certifications on the Covered Transactions.**

51.     From September 12, 2007, until May 10, 2012, Thayer applied for and received Reunion's approval for participation in the HUD-FHA DEL Program as described above.  In order to continue to participate in the DEL Program, Thayer, as Reunion's President, Principal Owner and Designated Broker, provided the requisite documentation and certified annually that Reunion was complying with HUD-FHA guidelines.

52.     Specifically, each  year between 2007 and 2011, Thayer provided annual certifications to HUD-FHA stating:

> I know or am in the position to know, whether the operations of the above-named mortgagee conform to HUD-FHA regulations, handbooks and policies.  I certify that to the best of my knowledge, the above-named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

53.     While unconditionally approved for participation in the DEL Program, Reunion employees endorsed the following Covered Transactions for HUD-FHA insurance: FHA Case Nos. 043-7533603, 042-8491871, 093-6480604, 042-08144426, 151-8357405, 043-7844332, 483-3929987, 421-4430394, 413-4874470, 411-4007716, 043-7511071, and 048-5356153.

54.     Each Covered Transaction at issue was either underwritten using an FHA-approved AUS program or manually underwritten by a Direct Endorsement underwriter employed by Reunion.

55.     In the case of the Covered Transactions underwritten using an AUS, a Reunion

Second Amended Complaint CV 13-2340 SBA

representative certified on HUD-92900-A to the integrity of the data supplied by Reunion to determine the quality of the loan and further certified that the mortgage is eligible for HUD-FHA mortgage insurance under the DEL program.

56.     In the case of the manually underwritten Covered Transaction (FHA Case No. 483-3929987), Reunion's DEL underwriter certified on HUD-92900-A to having personally reviewed the credit application and all associated documents and has used due diligence in underwriting the mortgage.  The underwriter further certified to finding that the mortgage is eligible for HUD-FHA mortgage insurance under the DEL program.

57.     The United States alleges that the aforementioned individual loan certifications on HUD-92900-A are false because of Reunion's failures to even meet HUD-FHA's minimum underwriting standards and, as a result, the Government has incurred losses in connection with the Covered Transactions.

58.     All of the Covered Transactions at issue in this matter were insured through the HUD-FHA DEL program, which Reunion could not participate in absent Thayer's annual certifications.

59.     For each loan, Reunion knowingly provided false statements to HUD-FHA when they either certified "to the integrity of the data supplied by the lender used to determine the quality of the loan" or when Reunion's DEL underwriter certified to having "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and hav[ing] used due diligence in underwriting the mortgage" and that the mortgage "is eligible for HUD mortgage insurance under the" DEL program.

60.     Each of the Covered Transactions went into default.  Insurance claims were presented to HUD-FHA, and HUD-FHA, in honor of its mortgage insurance commitments, paid the mortgage insurance claims.

61.     Both Reunion's individualized loan certifications and Thayer's annual certification were necessary for Reunion to retain DEL status and remain eligible for HUD-FHA funding.

**(FHA Case No. 042-8144426)**

62.     On November 28, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

Second Amended Complaint CV 13-2340 SBA

63.    Reunion represented the borrower's qualifying income as $8,076; however, the borrower's verified monthly income was $6,434.

64.    Reunion performed inadequate due diligence and improperly relied solely on the $8,076 monthly income reported on the borrower's mortgage application even though Reunion's verbal Verification of Employment ("VOE") confirmed the borrower earned $6,034.  Further, the borrower's 2007 tax return showed annual wages of $70,132 or $5,844 per month.

65.    Reunion represented the borrower's payment-to-income ratio, also called the "front-end" ratio as 26.85%, but the true ratio was 34%.

66.    Reunion represented the borrower's total debt-to-income ratio, also called the "back-end" ratio as 43.64%, but the true ratio was 55%.

67.    Had Reunion followed HUD-FHA policies, the borrower would not have qualified for the loan.

68.    These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

69.    After the borrower defaulted on the loan, HUD-FHA received a mortgage insurance claim in July 2010, and paid $78,477.89 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 042-8491871)**

70.    On August 11, 2009, Reunion approved this loan, thereby binding HUD-FHA to insure it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

71.    Reunion improperly accepted the co-borrower's unsupported self-employment income of $1,212 in violation of HUD-FHA guidelines.  Reunion performed inadequate due diligence and improperly relied solely on the mortgage application which stated the co-borrowers line of employment was "golf caddy" for seven years; however, the borrowers' 2007 tax forms stated the co-borrower's self-employment was doing "odd jobs" and the 2008 tax forms stated self-employment was as a "part time Sherpa."  In order to accept self-employment income, HUD-FHA requires, at a minimum, two years of successful self-employment in the same line of work.  The driving factor the underwriter is required to look for is the stability of this income in the past to justify its continuance for the foreseeable future.  Accordingly, the co-borrower's self-employment income must be removed from the application.

72.    Further, for self-employed borrowers HUD-FHA requires the underwriter to deduct business expenses from income and use only the profit or loss reported on line 12 of the borrower's tax return.  However, Reunion failed to deduct these expenses from the co-borrower's income.

73.    Reunion' use of an improperly inflated income when calculating the qualifying ratios resulted in favorable ratios for the borrowers which falsely passed HUD-FHA's acceptable back-end ratios.

74.    Reunion represented the back-end ratio as 41%, but the true ratio was 46%.

75.    Had Reunion followed HUD-FHA policies, borrower would not have qualified for the loan.

76.    These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

77.    After the borrowers defaulted on the loan, HUD-FHA received a mortgage insurance claim in January 2011, and paid $72,644.52 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 043-7511071)**

78.    On June 13, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

79.    Reunion performed inadequate due diligence and improperly relied on the mortgage application that stated the co-borrower's monthly income was $815; however, had Reunion obtained the co-borrower's current pay stubs, as required by HUD-FHA, they would have calculated her monthly income as $438.

80.    Reunion represented the front-end ratio as 36.3% but, the true ratio was 39.24%.

81.    Reunion represented the back-end ratio as 55.9%, but the true ratio was 59.95%.

82.    To counter-balance the effect of these excessively high ratios, Reunion presented as compensating factors that the borrower was a minimal user of credit.  However Reunion had in their possession a credit report that showed that borrower had six or more outstanding loans with a combined balance of $164,098.

83.    Further, Reunion ignored the negative indicator that the proposed housing expense of $2,047 was nearly twice the current housing expense of $1,150.

Second Amended Complaint CV 13-2340 SBA

84. Had Reunion followed HUD-FHA policies, the borrowers would not have qualified for the loan.

85. These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

86. After the borrowers defaulted on the loan, HUD-FHA received a mortgage insurance claim in March 2010, and paid $82,494.40 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 043-7533603)**

87. On July 11, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

88. Reunion falsely inflated both borrowers' incomes by solely relying on the values stated on the mortgage application that claimed the primary borrower's monthly income was $1,600 and the co-borrower's was $1,561. In fact, the primary borrower made $1,310 a month and the co-borrower made $986 a month.

89. Reunion represented the front-end ratio as 36.48%, but the true ratio was 50.22%.

90. Reunion represented the back-end ratio as 42.55%, but the true ratio was 58.58%.

91. Reunion failed to provide any compensating factors as justification for these excessively high ratios. In fact, Reunion ignored the borrowers' lack of capacity to repay the mortgage by not taking into consideration the borrower's inconsistent work history. Specifically, the primary borrower did not have a two-year history of full-time employment in the same line of work. Further, the primary borrower had an undocumented five month gap in employment. Both of these factors, when combined with the true, lower income figures, would significantly weigh against the AUS's decision to accept the application.

92. Reunion used false assets to qualify the borrowers. Reunion performed inadequate due diligence and improperly relied solely on the reported assets on the mortgage application that showed combined checking and savings assets of $2,922. However, the underwriter did not follow HUD-FHA guidelines and obtain borrowers' bank statements. Had the underwriter obtained these statements, it would have been known the borrowers had combined savings of only $112. This AUS variable's lack of integrity caused the system to provide a false approval.

Second Amended Complaint CV 13-2340 SBA

93. Had Reunion followed HUD-FHA policies, the borrowers would not have qualified for the loan.

94. These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

95. After the borrowers defaulted on the loan, HUD-FHA received mortgage insurance claims in October and December 2009, and paid $148,175.36 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 043-7844332)**

96. On May 26, 2009, Reunion approved this loan, thereby binding HUD-FHA to insure it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

97. Reunion represented the borrower's base employment income as $4,869; however, the borrower's verified monthly income was $3,985.

98. Reunion performed inadequate due diligence and improperly relied solely on the higher income amount stated on the mortgage application even though the VOE, the W-2s and the tax returns indicated a lower amount.

99. Reunion represented the front-end ratio as 39.1%, but the true ratio was 48.59%.

100. Reunion represented the back-end ratio as 48%, but the true ratio was 60%.

101. Further weighing against this loan was that it was a cash-out refinance with nearly 25% of the proceeds being used to pay-off existing debt. This is negative because, combined with the other factors, it indicates the borrower's inability to manage debt. Further, the subject property was in an economically depressed area which would indicate the property may not be able to maintain its value.

102. Had Reunion followed HUD-FHA policies, the borrower would not have qualified for the loan.

103. These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

104. After the borrower defaulted on the loan, HUD-FHA received mortgage insurance claims in October 2010 and March 2011, and paid $270,864.72 pursuant to HUD-FHA's insurance obligations.

Second Amended Complaint CV 13-2340 SBA

**(FHA Case No. 048-5356153)**

105.    On August 31, 2009, Reunion approved this loan, thereby binding HUD-FHA to insure it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

106.    Reunion omitted a debt of $4,889, representing only $352 in monthly payment obligations, from the underwriting analysis. In fact, the AUS findings required evidence of this debt's payoff prior to funding.  However, because it was marked for payoff prior to funding it was not included in the underwriting analysis and thus, the underwriter represented this borrower's debt as lower than it actually was.

107.    Reunion represented the back-end ratio as 55.15%, but the true ratio was 61.81%.

108.    Had Reunion followed HUD-FHA policies, the borrower would not have qualified for the loan.

109.    These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

110.    After the borrower defaulted on the loan, HUD-FHA received a mortgage insurance claim in January 2011, and paid $44,776.08 pursuant to HUD's insurance obligations.

**(FHA Case No. 093-6480604)**

111.    On October 29, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

112.    The borrower's income and employment were not properly verified by the underwriter as required by HUD-FHA underwriting guidelines. HUD-FHA's underwriting guidelines require a borrower's most recent year-to-date pay stub documenting one full month's earnings; however, Reunion documented only one pay stub showing less than one full month.  Further, the pay stub identified the income as commission and not base pay.  If commission income is used to qualify it must be documented for two years and be reasonably expected to continue.  Further, the VOE did not clearly identify the borrower's income but commented "per pay stub," which showed $2,486 which was considerably lower than the $3,203 on the mortgage application.

113.    In 2006, the borrower's income was 100% commission from the real estate business.  In 2007, the borrower continued with his real estate business but experienced a dramatic decline in sales.

In 2007, the borrower began working in the trucking business and, based on the pay stub provided, 100% of his income from this business was commission.  For 2008, the borrower provided no income documentation from his real estate business.

114.     HUD-FHA guidelines state "[c]ommission income showing a decrease from one year to the next requires significant compensating factors before a borrower can be approved for the loan."  The borrower's real estate income decreased by 73% from 2006 to 2007 and was non-existent in 2008, rendering any real estate related income unusable.

115.     Depending on when in 2007 the borrower transitioned from real estate to trucking, his 2008 commission when he applied for the mortgage was for either less than one year or greater than one year but less than two years.

116.     If the borrower had been in the trucking business for less than one year, then, according to HUD guidelines, his income from that business could not be considered in approving the loan.

117.     If the borrower had been in the trucking business for more than one year but less than two years his income from that business could only be used if the "underwriter can: a) document the likelihood that the income will continue, and b) soundly rationalize accepting the commission income." However, the underwriter made no such documentation or rationalization.  Undermining the ability to use his trucking income is the fact that within the last two years he had completely changed business from real estate to trucking.

118.     Setting aside the fact that the borrower's commission income was not documented or even usable, accepting the amount on the pay stub provided ($2,486) rather than what the borrower provided on the mortgage application would result in a back-end ratio of 63%, which is considerably higher than the 56% Reunion represented as true.

119.     Even assuming the borrower's income could be used at all, Reunion failed to properly calculate his income.  HUD-FHA guidelines require that for borrowers making 25% of more of their income from commissions, unreimbursed business expenses must be deducted from their income.  Here, the borrower's income was at all times 100% commission.  The 2007 tax return Schedule C showed $19,350 of unreimbursed business expenses leaving a net income for the year of $7,550.   The borrower's 2006 Schedule C showed $42,704 of unreimbursed business expenses showing a net income

1  of $27,968.  Further, no due diligence was done to understand and account for the borrower's trucking-

2  related business expenses.  Had these business expenses been deducted from the borrower's income the

3  front-end and back-end ratios would have been significantly higher still.

4      120.  Further, Reunion failed to properly verify the borrower's current employment.  The VOE

5  in the file indicates a start date of 09/17/08; which is clearly false considering the pay stub provided by

6  the borrower was dated 08/07/08.  Reunion failed to resolve this discrepancy.

7      121.  Reunion ignored the borrowers' poor credit history.  In 2003, the co-borrower had her

8  chapter 7 bankruptcy discharged.  While HUD-FHA only requires, at a minimum, two years to have

9  passed since the bankruptcy, HUD-FHA also requires the borrower to reestablish good credit or choose

10  to not incur new obligations. However, the borrowers amassed 12 new loans in those five years totaling

11  over $78,000 in new debt.  This shows Reunion's poor due diligence in assessing the borrowers'

12  willingness to repay this loan.

13      122.  Had Reunion followed HUD-FHA policies, the borrowers would not have qualified for

14  the loan.

15      123.  These false statements were material to the AUS system's acceptance of this application

16  and the issuance of mortgage insurance by HUD-FHA.

17      124.  After the borrowers defaulted on the loan, HUD-FHA received a mortgage insurance

18  claim in October 2010, and paid $246,240.51 pursuant to HUD-FHA's insurance obligations.

19      **(FHA Case No. 151-8357405)**

20      125.  On May 27, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure it;

21  however, the data Reunion supplied to the AUS lacked the necessary integrity.

22      126.  The borrower's mortgage application was dated May 6, 2008.

23      127.  To verify income and employment, HUD-FHA requires the most recent full month's pay

24  stub showing, among other things, current and year-to-date earnings.  According to HUD-FHA

25  guidelines, "most recent" means the most recent available at the time of application.  In this case, the

26  most recent full month's pay stubs would have included pay through April 30, 2008.  However, Reunion

27  only collected pay stubs through March 27, 2008.  Had Reunion collected the most recent pay stubs,

28  through the end of April, 2008, it would have been clear that the borrower was currently on leave and

Second Amended Complaint CV 13-2340 SBA

1   not earning overtime income.

2   128.   Reunion were in possession of a note from the borrower's doctor dated March 27, 2008,

3   prescribing leave from work to relieve stress, anxiety, and panic attacks.

4   129.   This combination of the lack of April pay stubs and the March doctor's note is evidence

5   that the borrower was experiencing a significant change in income and the stability of future overtime

6   income was seriously in question.

7   130.   The AUS findings required that if overtime income was used to qualify the borrower, it

8   needed to be verified for two years and have a reasonable expectation of continuing.  However, there

9   was no reasonable expectation the borrower's overtime would continue.

10   131.   Reunion represented the front-end ratio as 29.63%, but the true ratio was 43.8%.

11   132.   Reunion represented the back-end ratio as 29.87%, but the true ratio was 44.2%.

12   133.   Had Reunion followed HUD-FHA policies, the borrower would not have qualified for the

13   loan.  In fact, the stated reason for swift delinquency was the borrower's unemployment due to the

14   medical leave that was documented at the time of the borrower's application.

15   134.   These false statements were material to the AUS system's acceptance of this application

16   and the issuance of mortgage insurance by HUD-FHA.

17   135.   After the borrower defaulted on the loan, HUD-FHA received mortgage insurance claims

18   in October and December 2009, and paid $189,408.73 pursuant to HUD-FHA's insurance obligations.

19   **(FHA Case No. 411-4007716)**

20   136.   On January 11, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure

21   it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

22   137.   The borrowers did not have sufficient funds to close the loan as required by HUD-FHA.

23   The loan required a cash investment of $2,153; however, the borrowers' bank records showed a balance

24   at the time of the loan of only $987.  Reunion failed to account for the shortfall or provide any

25   documentation showing the source of the required funds.

26   138.   Reunion omitted over $32,000 in liabilities, representing $855 of monthly obligations,

27   from the underwriting analysis during liability reconciliation without documentation that supported the

28   omission.

Second Amended Complaint CV 13-2340 SBA

1    139.    Reunion calculated the primary borrower's monthly income by improperly including

2    unsupported overtime pay.  Despite an AUS requirement that overtime could only be included if verified

3    for the past two years with the same employer, Reunion included $1,136 of year-to-date overtime, which

4    inflated the primary borrower's monthly income by $113.

5    140.    Reunion calculated the co-borrower's monthly income by improperly including

6    unsupported commission income.  If a borrower's income is 25% or more from commission, the AUS

7    requires the commission to be verified using the past two years' tax returns.   The mortgage application

8    indicated 100% of the co-borrower's income was from commissions.  The borrowers' previous two

9    years tax returns supported monthly commission of $2,468; however, Reunion only averaged the current

10   year's commission income.  This overstated the co-borrower's monthly income by $522.

11   141.    The borrowers' overstated income and understated liabilities led to falsely favorable

12   qualifying ratios.

13   142.    Reunion represented the back-end ratio as 51%, but the true ratio was 74%.

14   143.    Had Reunion followed HUD-FHA policies, the borrowers would not have qualified for

15   the loan.

16   144.    These false statements were material to the AUS system's acceptance of this application

17   and the issuance of mortgage insurance by HUD-FHA.

18   145.    After the borrowers defaulted on the loan, HUD-FHA received a mortgage insurance

19   claim in May 2009, and paid $61,095.39 pursuant to HUD-FHA's insurance obligations.

20                                    **(FHA Case No. 413-4874470)**

21   146.    On August 7, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure it;

22   however, the data Reunion supplied to the AUS lacked the necessary integrity.

23   147.    Reunion performed inadequate due diligence and improperly relied on the mortgage

24   application when it included $584 of retirement income.  The only verification of this income was a

25   letter from the Ohio Public Employees Retirement system which was addressed to the co-borrower and

26   another individual stating payments began on January 1, 1998.  However, at that time the co-borrower

27   was eleven years old which would ordinarily make the co-borrower ineligible to receive retirement

28   benefits.  Further, no effort was made to document any relationship between the co-borrower and the

Second Amended Complaint CV 13-2340 SBA

retiree receiving the benefits in order to explain including the retirement income in the co-borrower's total income.

148.    Reunion calculated the primary borrower's monthly income by improperly including unsupported overtime pay.  Despite an AUS requirement that overtime could only be included if verified for the past two years with the same employer, Reunion included unsupported overtime which inflated the primary borrower's monthly income by $848.

149.    Reunion represented the front-end ratio as 26%, but the true ratio was 40%.

150.    Reunion represented the back-end ratio as 47% but the true ratio was 72%.

151.    Had Reunion followed HUD-FHA policies, the borrowers would not have qualified for the loan.

152.    These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

153.    After the borrowers defaulted on the loan, HUD-FHA received mortgage insurance claims in May 2010 and July 2010, and paid $154,969.81 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 421-4430394)**

154.    On August 28, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure it; however, the data Reunion supplied to the AUS lacked the necessary integrity.

155.    The borrowers applied for this loan on July 25, 2008.  However, on June 18, 2008, the co-borrower terminated her employment with Connor's Drilling.  AUS findings require the most recent year-to-date pay stub, which would have been through June 30, 2008; however, Reunion only considered pay stubs through the end of April, 2008, which were nearly three-months old at the time of the application.  Had Reunion followed these guidelines and obtained pay stubs through the end of June, 2008, it would have known that the co-borrower's employment had been terminated.

156.    Further, Reunion's VOE contradicted the mortgage application.  The VOE stated that the co-borrower worked for Schlumberger; however, the mortgage application stated she worked for Connor's Drilling.

Second Amended Complaint CV 13-2340 SBA

157.    Reunion falsely inflated the primary borrowers' income by solely relying on the values stated on the mortgage application that claimed his monthly income was $2,987.  However, his true income was $2,080 a month.

158.    Reunion represented the front-end ratio as 23.19%, but the true ratio was 51.63%.

159.    Reunion represented the back-end ratio as 40%, but the true ratio was 89.7%.

160.    Had Reunion followed HUD-FHA policies, the borrowers would not have qualified for the loan.

161.    These false statements were material to the AUS system's acceptance of this application and the issuance of mortgage insurance by HUD-FHA.

162.    After the borrowers defaulted on the loan, HUD-FHA received mortgage insurance claims in April and June 18, 2010, and paid $143,629.28 pursuant to HUD-FHA's insurance obligations.

**(FHA Case No. 483-3929987)**

163.    On August 8, 2008, Reunion approved this loan, thereby binding HUD-FHA to insure it.

164.    Initially, this loan was processed under the AUS; however, AUS finding #4 red flagged this loan because of "an unusually high number of submissions.  Excessive submissions can indicate improper manipulation of the loan application data."  Accordingly, this loan was referred to the DEL-qualified underwriter for manual underwriting "to ensure accuracy."

165.    Nevertheless, Reunion's Direct Endorsement underwriter approved this loan for HUD-FHA insurance.

166.    Reunion did not obtain the borrower's most recent pay stub and appropriate VOE as required by HUD-FHA's underwriting guidelines.

167.    Reunion falsely identified the borrower's position as "shop supervisor;" however, the VOE from the employer identified the borrower's position as that of "shop tech."

168.    Reunion relied on three incomplete pay stubs provided by the borrower.  The pay stubs did not identify the employer, misidentified the borrower's position as shop supervisor, and did not clearly identify the borrower's salary or the reasonable continuance of overtime income.  In fact, the three pay stubs showed weekly hours of 69.2, 50.1, and 40.8, which showed that overtime was actually inconsistent.

169.   To include overtime, AUS findings require two years' documentation supporting the overtime and a reasonable expectation it will continue; however, Reunion obtained no documentation beyond the three incomplete pay stubs.

170.   Reunion represented the front-end ratio as 22.2%, but the true ratio was 35.96%— more than 4% higher than the maximum allowed for manually underwritten loans.

171.   Reunion represented the back-end ratio as 43%, but the true ratio was 54%—11% higher than the maximum ratio allowed for manually underwritten loans.

172.   Had Reunion followed HUD-FHA policies, the borrower would not have qualified for the loan.

173.   These false statements were material to the issuance of mortgage insurance by HUD-FHA.

174.   After the borrower defaulted on the loan, HUD-FHA received mortgage insurance claims in July and September 2009, and paid $137,731.20 pursuant to HUD-FHA's insurance obligations.

**C.     The Payment of the Dividend**

175.   Defendant Thayer, as Principal Owner, owns 50.75% of Reunion and Defendant Harvey owns 49.25% of Reunion.

176.   At all relevant periods, Thayer was the Chair of the Board of Directors for Reunion and Harvey was a Board Member.

177.   In 2010, Reunion reported on their tax returns $65,671,496 in assets

178.   In 2011, Reunion reported on their tax returns $38,576,335 in assets

179.   In 2012, Reunion initially reported on sworn financial statements $15,324,826 in assets in the first quarter, but in July 2012, reported $202,968 and in August 2012, reported $90,381.

180.   On December 21, 2011, December 28, 2011, March 23, 2012, April 19, 2012, and April 30, 2012, Reunion made dividend payments to Defendant Thayer totaling $901,210.13.

181.   On December 21, 2011, December 28, 2011, March 23, 2012, April 19, 2012, and April 30, 2012 Reunion made dividend payments to Defendant Harvey totaling $874,573.37.

182.   On April 24, 2012, Harvey and Thayer met alone as Reunion's Board of Directors and approved "a dividend distribution sufficient enough to liquidate the corporation."

Second Amended Complaint CV 13-2340 SBA

**FIRST CAUSE OF ACTION**

**False Claims Act, 31 U.S.C. § 3729(a)(1) (2006) and, as amended, 31 U.S.C. § 3729(a)(1)(A)**

**Presenting or Causing False Claims to Be Presented (Reckless Underwriting)**

183.    The Government incorporates by reference paragraphs 1 through 174 as if set forth fully herein.

184.    By virtue of the acts described above and in violation of 31 U.S.C. § 3729(a)(1) (2006) , and, as amended, 31 U.S.C. § 3729(a)(1)(A), Defendants Reunion and Thayer engaged in reckless underwriting of the Covered Transactions.

185.    As set forth above, Reunion, knowingly, or acting with deliberate ignorance and/or reckless disregard for the truth, caused false or fraudulent claims for FHA insurance to be presented to an officer or employee of the United States Government by, *inter alia*, annually representing and certifying to HUD-FHA as a DEL all of Reunion's loans were eligible for FHA insurance when they were not.   Reunion knowingly, or acting with deliberate ignorance and/or reckless disregard for the truth, caused false or fraudulent claims for FHA insurance to be presented to an officer or employee of the United States Government.  Reunion did so by, *inter alia*, acting as a DEL and submitting false loan level certifications for FHA loans to HUD-FHA in order to get FHA to endorse these mortgages that did not meet HUD requirements and contained unacceptable risk for FHA insurance.

186.    Reunion knowingly, or acting with deliberate ignorance and or/reckless disregard for the truth, presented to an officer or employee of the Government false or fraudulent claims for payment when it submitted claims for HUD-FHA insurance for the defaulted Covered Transactions that  Reunion as a DEL falsely certified were  eligible for HUD-FHA insurance.

187.    A truthful individual loan certification for HUD-FHA endorsement is a condition of payment of FHA insurance on that loan.  HUD-FHA paid insurance claims, and incurred losses, on the Covered Transaction that were falsely certified as eligible for HUD-FHA insurance.

188.    By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each transaction.

Second Amended Complaint CV 13-2340 SBA

**SECOND CAUSE OF ACTION**

**False Claims Act, 31 U.S.C. § 3729(a)(2) (2006), and, as amended, § 3729(a)(1)(B)**

**Use of False Statements in Support of False Claims (Reckless Underwriting)**

189.    The Government incorporates by reference paragraphs 1 through 174 as if set forth fully herein.

190.    By virtue of the acts described above and in violation of 31 U.S.C. § 3729(a)(2) (2006), and, as amended, § 3729(a)(1)(B), Reunion  knowingly, or acting with deliberate ignorance and or/reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims with respect to the Covered Transactions that Reunion falsely certified were eligible for HUD-FHA insurance.  Specifically, senior management knowingly submitted false annual certifications to HUD-FHA and Reunion knowingly submitted false individual loan certifications to HUD-FHA, representing, *inter alia*, that each loan was eligible for HUD-FHA mortgage insurance under the DEL program.

191.    Through these  annual certifications, Reunion was an approved DEL.  Reunion in turn submitted false individual loan certifications to induce HUD-FHA to endorse Covered Transactions for insurance and to get HUD-FHA to pay false insurance claims when the Covered transactions defaulted.

192.    A truthful individual loan certification for HUD-FHA endorsement is a condition of payment of FHA insurance on that loan.  HUD-FHA paid insurance claims, and incurred losses, on the Covered Transaction that were falsely certified as eligible for HUD-FHA insurance.  By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each transaction.

**THIRD CAUSE OF ACTION**

**Negligence**

193.    The Government incorporates by reference paragraphs 1 through 174 as if set forth fully herein.

194.    On June 30, 2011, Cliff Cole of HUD's Headquarters, using the methodology implemented by the Office of Inspector General ("OIG"), flagged 26 of Reunion's defaulted loans for review.  HUD OIG began reviewing those files on October 25, 2011, and uncovered the fraudulent

Second Amended Complaint CV 13-2340 SBA

conduct described above.

195.    Prior to June 30, 2011, no responsible government official knew or reasonably should have known of the facts constituting Reunion's negligence.

196.    Reunion owed the Government a reasonable duty of care and a duty to conduct due diligence.

197.    As set forth above, through Reunion's individualized loan certifications and the annual certifications necessary for Reunion to retain DEL status, both , breached their duties to the Government.

198.    As a result of Defendants' breaches of their duties, the Government paid insurance claims, and incurred losses, relating to HUD-FHA insured mortgages approved by Reunion.

199.    By virtue of the above, the Government is entitled to compensatory damages, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Payment by Under Mistake of Fact

200.    The Government incorporates by reference paragraphs 1 through 174 as if set forth fully herein.

201.    The United States seeks relief against Reunion to recover payments made under mistake of fact.

202.    On information and belief, Reunion submitted, and HUD-FHA paid, $1,630,527.89 in insurance claims on the defaulted Covered Transactions that Reunion falsely certified were eligible for insurance.

203.    HUD-FHA made payments to Reunion under the mistaken belief that the defaulted Covered Transactions had been eligible for HUD-FHA insurance.

204.    By reason of the foregoing, the United States has been damaged in a substantial amount to be determined at trial.

Second Amended Complaint CV 13-2340 SBA

**FIFTH CAUSE OF ACTION**

**Breach of Fiduciary Duty**

205.     The Government incorporates by reference paragraphs 1 through 174 as if set forth fully herein.

206.     HUD-FHA and Reunion have a special relationship of trust and confidence by virtue of Reunion's participation in the DEL program.  The DEL empowered Reunion to obligate HUD-FHA to insure mortgages it issued without any independent HUD-FHA review.  Therefore, Reunion were in a position of advantage or superiority in relation to HUD-FHA and is a fiduciary to HUD-FHA.

207.     As a fiduciary, Reunion had a duty to act for, and give advice to, the Government for benefit of the Government as to whether mortgages should be insured by HUD-FHA under the DEL program.

208.     As a fiduciary, Reunion had an obligation to act in the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity in its dealings with the Government.

209.     As set forth above, Reunion breached their fiduciary duty to HUD-FHA.

210.     As a result of Reunion's breach of fiduciary duty, HUD-FHA has paid insurance claims and incurred losses.

211.     By reason of the foregoing, the Government is entitled to compensatory damages in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**Federal Debt Collection Procedures Act**
**Fraudulent Transfer - 28 U.S.C. § 3304(a)**

211.     The Government incorporates by reference paragraphs 1 through 182 as if set forth fully herein.

212.     This is a fraudulent transfer action under 28 U.S.C. § 3304(a)(1).

213.     Reunion made each of the transfers described in paragraphs 180 and 181, above, to Mr. Thayer and Mr. Harvey, without receiving a reasonably equivalent value, as defined in 28 U.S.C. § 3303(b).

214.     The transfers to Mr. Thayer and Mr. Harvey were made after the debt to the United States

Second Amended Complaint CV 13-2340 SBA

1  arose and intentionally hindered, delayed or defrauded the United States, as creditor.  28 U.S.C. §
2  3304(b).

3  215.    Reunion was insolvent, as defined in 28 U.S.C. § 3302, at the time of the transfers or was
4  made insolvent as a result of the transfers.

5  216.    The United States seeks voidance of the transfers to the extent necessary to satisfy
6  Reunion's debt to the United States.  28 U.S.C. § 3306(a)(1).

7  217.    The United States seek a judgment for the value of the assets transferred, not to exceed
8  Reunion's debt to the United States.

9  **SEVENTH CAUSE OF ACTION**

10  **Federal Debt Collection Procedures Act**
**Fraudulent Transfer - 28 U.S.C. § 3304(b)**

11

12  218.    The Government incorporates by reference paragraphs 1 through 182 as if set forth fully
13  herein.

14  219.    This is a fraudulent transfer action under 28 U.S.C. § 3304(b)(1)(B).

15  220.    Reunion made each of the transfers described in paragraphs 180 and 181, above, to Mr.
16  Thayer and Mr. Harvey, without receiving a reasonably equivalent value for the transfer.

17  221.    At the time of the transfer in December 2011 through April 2012, Reunion should have
18  reasonably believed that it did not have the ability to pay its debts as they became due.

19  222.    The United States seeks voidance of the transfers to the extent necessary to satisfy
20  Reunion's debt to the United States.  28 U.S.C. § 3306(a)(1).

21  223.    The United States seek a judgment for the value of the assets transferred, not to exceed
22  Reunion's debt to the United States.

23  **PRAYER FOR RELIEF**

24          WHEREFORE, the United States demands judgment against Defendants as follows:

25  a)      On Counts One and Two (False Claims Act), judgment for the Government against
26  Reunion, treble the Government's damages, and civil penalties for the maximum amount allowed by
27  law;

28  b)      On Counts Three, Four, and Five (Negligence,  Payment Under Mistake of Fact and

Breach of Fiduciary Duty), judgment for the Government against Reunion and compensatory damages including prejudgment interest, making the Government whole for past losses;

      c)     On Count Six and Seven (Federal Debt Collection Procedures Act), judgment for the Government against Defendants that pursuant to 28 U.S.C. § 3304, the transfers by Reunion to Mr. Thayer and Mr. Harvey between December 2011 and April 2012 are null and void and that those assets are deemed property of Reunion and encumbered by the judgment for the United States and/or that Mr. Thayer and Mr. Harvey are indebted to the United States for the transferred amounts.

      d)     For an award of costs pursuant to 31 U.S.C. § 3729(a) and

      e)     For an award of any further relief as the Court shall deem just and proper.

Dated: December 4, 2013                 Respectfully submitted,

                                    MELINDA HAAG
                                    United States Attorney

                           _____/s/_____
                                    ILA C. DEISS
                                    Assistant United States Attorney

                                    Attorneys for United States of America